# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| DOUGLAS H. McELROY, | \* | |
| | \* | No. 17-1083V |
| Petitioner, | \* | Special Master Christian J. Moran |
| | \* | |
| v. | \* | |
| | \* | Filed: October 11, 2019 |
| SECRETARY OF HEALTH | \* | |
| AND HUMAN SERVICES, | \* | Attorneys' fees and costs, |
| | \* | reasonable basis. |
| Respondent. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>Nancy R. Meyers</u>, Ward Black Law, Greensboro, NC, for petitioner;
<u>Amy P. Kokot</u>, United States Dep't of Justice, Washington, DC, for respondent.

## PUBLISHED DECISION DENYING PETITIONER'S MOTION FOR ATTORNEYS' FEES AND COSTS[1]

On October 19, 2018, the undersigned issued an order concluding proceedings on Mr. McElroy's petition pursuant to Vaccine Rule 21(a). Mr. McElroy filed a timely motion for attorneys' fees and costs, requesting $23,380.14. In his response, filed October 24, 2018, the Secretary challenged the reasonable basis for Mr. McElroy's petition and, accordingly, his eligibility for an award of fees and costs. Both parties were then given the opportunity to file supplemental briefs on the issue of reasonable basis, concluding with petitioner's reply on April 26, 2019. Based upon a review of the facts of Mr. McElroy's petition, the undersigned finds that Mr. McElroy never possessed a reasonable basis for

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this decision on its website. This posting will make the decision available to anyone with the internet. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

pursuing a claim that he was injured as a result of a vaccination.  Accordingly, he is not eligible for an award of fees and costs and his motion is DENIED.

## I.    Factual History

### A.    Medical History before Vaccination

Mr. McElroy had a somewhat extensive medical history prior to the vaccination in question.  This history showed that he had suffered from alcoholism, anxiety, back pain, basal cell carcinoma, diabetes, hypertension, insomnia, and pancreatitis.  Exhibit 2 at 10.

However, the records do not indicate that Mr. McElroy was chronically seeking care up to the date of the vaccination.  For example, he visited his physician on October 19, 2012, for complaints of joint pain, diabetes, and insomnia.  Id. at 5-6.  He was seen on January 2, 2013, with complaints of bilateral lower extremity pain.  Id. at 22.  He noted that this pain was ongoing from the pain that precipitated his October 19, 2012 visit and that the pain had been present ever since and has been evolving since that date.  Id.  It is not clear if there is tingling or numbness associated with the pain, but Mr. McElroy did note a burning sensation.  Id.  He was diagnosed with degeneration of lumbar intervertebral disc, lumbar spondylosis, and lumbar radiculopathy.  Id.

Mr. McElroy returned to the physician on April 17, 2013, noting ongoing problems related to diabetes, hypertension, and back pain.  Id. at 30.  At discharge he was advised to follow up in four months.  Id. at 32.  He was seen four months later, on August 15, 2013, for back pain and he noted during the visit that he had been under a lot of stress recently.  Id. at 38.  It was nearly a year after this visit, on August 6, 2014, that he next sought medical treatment.  At this visit he complained of an inability to focus at work and that he was often late for personal and professional events.  Id. at 43.  Mr. McElroy was discharged with referrals to endocrinology for his diabetes, psychology for his concentration issues, and dermatology for a skin growth.  Id. at 53.  Otherwise, the exam was unremarkable, and Mr. McElroy was advised to return in three months.  Id. at 55.

Before three months' time, Mr. McElroy was seen in an urgent care facility on October 31, 2014.  Exhibit 1 at 1.  His chief complaint was pain in his lower left back that he attributed to moving heavy items the previous week.  Id.  Mr. McElroy did not experience any burning or tingling or weakness in his limbs.  He stated that he believed the pain could be relieved with a shot of cortisone, some Vicodin, muscle relaxant, and a Lidoderm patch.  Id. at 4.  The physician appeared to agree since Mr. McElroy was assessed with a lumbar strain and was

administered a corticosteroid shot, Vicodin, a muscle relaxant, and a Lidoderm patch. Id. The facility noted that Mr. McElroy had not had a pneumonia vaccine in over 10 years and was out of date for his flu vaccine and that he had requested, and was administered, both. Id. at 1, 5. Mr. McElroy's August 9, 2017 petition claimed that the October 31, 2014 flu and/or pneumonia vaccine caused him to suffer "small fiber neuropathy and debilitating paresthesias." Pet. ¶ 23.

### B. Medical History after Vaccination

Mr. McElroy returned to urgent care nearly a month later on November 28, 2014. Exhibit 3 at 3. Mr. McElroy presented with complaints of numbness in his left thumb beginning two days earlier. Id. Since the onset of numbness in his thumb, Mr. McElroy experienced more diffuse numbness in left upper and lower extremities. Mr. McElroy stated a concern that his symptoms were attributable to Guillain-Barré related to his recent flu shot. Id. Labs, imaging, and a physical exam were normal. Id. at 8. Mr. McElroy was offered admission to the hospital, but refused, stating that he would follow up, outpatient, with neurology and his PCP. Id.

On December 3, 2014, Mr. McElroy followed up with his primary care physician. Exhibit 2 at 61. The report to the PCP relayed substantially similar complaints as the report provided to urgent care just days earlier. Id. The physician's notes indicate that he suspected that the new onset of symptoms could be related to poor management of Mr. McElroy's diabetes and/or a "significant amount of stress at this time in his personal life." Id. The physician repeatedly noted that Mr. McElroy would be evaluated by a neurologist the next day and appeared to refrain from making conclusions regarding his condition other than an advisement to seek urgent care if his symptoms changed or worsened. Id. at 63.

Mr. McElroy visited with his neurologist, Howard Kraft, the next day. Exhibit 4 at 1. During the visit, Mr. McElroy communicated that he noticed the onset of numbness shortly after putting together a swing set and that he "might have pulled something". Id. Dr. Kraft noted that labs, imaging, and exam were all normal. Id. at 7. Dr. Kraft concluded that Mr. McElroy's condition should be considered the result of "a small stroke until proven otherwise." Id. at 9. Dr. Kraft ordered an MRI of Mr. McElroy's brain. Id.

Mr. McElroy returned to the emergency department on December 15, 2014, with a complaint that he began experiencing the numbness and tingling on the right side of his body (previously he experienced these symptoms on the left). Exhibit 5 at 2. The treating physician noted that Mr. McElroy appeared to be suffering from high levels of stress (petitioner himself described it as "the most stress he's ever

dealt with his entire life") and that Mr. McElroy had been "googling" his symptoms and is concerned that his symptoms may be a reaction to the flu shot he received in October.  Id.  Mr. McElroy stated that this concern was amplifying his stress.  Id.  The notes state that both Mr. McElroy's wife and daughter spoke with the treating physician privately and expressed an opinion that the symptoms were associated with stress.  Id.  The overall impression by the physician was non-specific, and the physician encouraged Mr. McElroy to be sure to attend the neurology appointment he had scheduled in two days.  See id. at 4.

Mr. McElroy visited with his neurologist, Dr. Kraft, on December 17, 2014, to discuss the results from his MRI.  Exhibit 4 at 24.  Dr. Kraft noted that the MRI was "relatively normal" and that it did not explain Mr. McElroy's symptoms.  Id.  Dr. Kraft stated that he would like to order additional MRIs of his cervical and thoracic regions before making his assessment.  Id.

Mr. McElroy revisited Dr. Kraft on December 30, 2014.  Exhibit 4 at 35.  Dr. Kraft noted that petitioner continued to have sensory complaints.  Id.  More specifically, Mr. McElroy continued to experience a loss of sensation around his trunk and his upper and lower extremities in addition to his genitals.  Id.  Dr. Kraft noted that his cervical and thoracic MRIs were normal aside from some degenerative changes that did not explain Mr. McElroy's condition.  Id.  Dr. Kraft concluded that the combination of the continued symptoms in light of an unremarkable work-up indicated that Mr. McElroy's condition "could be related to small fiber involvement, especially if it is involving the sensory enervation to the rectum and anus."  Id. at 37.  Dr. Kraft noted that Mr. McElroy's metabolic condition should thus be more closely examined and that his condition could be related to diabetes.  Id. at 37-38.  Dr. Kraft recommended nerve conduction studies.  Id.

Nerve conduction studies and EMGs were performed on January 28, 2015, and February 11, 2015.  Exhibit 4 at 39-59.  Dr. Kraft concluded from these studies that there was evidence of "chronic denervation reinnervation changes."  Id. at 75.  Dr. Kraft ordered a lumbar puncture to help with the differential diagnosis.  Id.

Mr. McElroy and Dr. Kraft exchanged several emails in March of 2015.  Id. at 98-99.  In those emails, Mr. McElroy expressed continued concern about his symptoms and notes that the numbness has not subsided and continues to impact his life as well as his outlook on his life.  Id. at 98.  Mr. McElroy noted that he was concerned that the symptoms started in relative proximity to the flu and pneumonia vaccinations he received in October 2014.  Id.  In his responses, Dr. Kraft stated that the lumbar puncture did not reveal any abnormalities and he recommended

4

that Mr. McElroy simultaneously seek a second opinion regarding his condition. Id. at 99.  He did not acknowledge or address the comment regarding the vaccination.  Id.

In May of 2015, Mr. McElroy obtained a second opinion from Dr. Vanessa Baute, a neurologist.  Exhibit 5 at 161.  Dr. Baute noted that the skin biopsy was positive for small fiber neuropathy, which "is most likely related to his diabetes." Id.  During the visit, Mr. McElroy communicated that he was struggling with several psychological issues and continued to have concerns about the effects the numbness he is experiencing has affected his life.  Id. at 161-62.  In Dr. Baute's assessment, her statements regarding the cause of Mr. McElroy's disease are more conclusory, noting "skin biopsy confirmed small fiber neuropathy due to diabetes. I do not suspect Lyme's disease or vaccine reaction."  Id. at 164.  Dr. Baute recommended that Mr. McElroy start on Neurontin for the neuropathic pain and noted that there was no further neurological work needed at that time.  Id.  She also strongly recommended that Mr. McElroy seek a psychological/psychiatric referral for his psychological struggles and that Mr. McElroy address his small fiber neuropathy through control of his diabetes.  Id.

Mr. McElroy also sought a second opinion from Dr. Temple Day on May 8, 2015.  Id. at 174.  Dr. Day also concluded that the small fiber neuropathy that petitioner was suffering from was "likely related to his [diabetes]."  Id. at 176. However, Dr. Day also noted that she was "not sure the whole of his symptomatology is attributable to this [diagnosis]."  Id.  Dr. Day reviewed that the differential for the neuropathy included many things in addition to diabetes, including autoimmune, Lyme disease, environmental, and idiopathic causes.  Id. Dr. Day did note that she thought that Mr. McElroy's psychological state was "likely contributing to some of his [symptoms] as well."  Id.

In an email to Dr. Day on June 23, 2015, Mr. McElroy emailed Dr. Day in response to an ongoing discussion about what may have caused his condition.  Id. at 241.  In the emails, Mr. McElroy noted that he was convinced that the cause was related to either 1) a tick bite he received in May or June 2014, 2) the vaccinations he received on October 31, 2014, or 3) the physical strain he exerted building the swing set the day before the numbness started.  Id.  It does not appear that Dr. Day commented on these potential causes in that email chain. Id. at 241-42.

Mr. McElroy visited with an infectious disease specialist, Dr. Shara Ann Betito, on June 25, 2015, to explore whether the tick bite may be the underlying cause of his symptoms.  Id. at 257.  The physician concluded that there was "no evidence of Lyme disease to explain his sensory symptoms."  Id.  The physician,

who noted herself that it was outside of her specialty, remarked that Mr. McElroy's symptoms were an "unusual presentation" of peripheral neuropathy.  Id.  She further stated that there should be a work-up for other possible etiologies by neurology and also notes that "some researchers believe this to be a psychosomatic disorder" that "has had some success with anti-depressants." Id.

The psychosomatic theory for Mr. McElroy's condition was also endorsed in the notes by Dr. Kristopher Hansen, DO, a rheumatologist following a visit on September 16, 2015.  At this visit, after Lyme disease had been largely ruled out, Mr. McElroy expressed a concern that the flu and pneumonia vaccines he received in October 2014 may be related to his presentation.  Exhibit 5 at 284.  Dr. Hansen reviewed some of the personal and professional stressors that coincided with Mr. McElroy's presentation.  Dr. Hansen remarked that he did not believe that Mr. McElroy had an underlying autoimmune joint disorder, noting that the ANA titer was "weakly positive at 1:40" and that he did "not feel this to be contributory." Id. at 286.  Ultimately, Dr. Hansen concluded that he felt that Mr. McElroy's "presentation is likely consistent with Conversion Disorder given social stressors and temporal association with symptoms and distribution of symptoms in setting of extensive neurological work up as above." Id. at 286-87.

Following on these recommendations, Mr. McElroy was seen by a psychiatrist, Dr. Shaji Puthuvel, M.D., on February 4, 2016.  Exhibit 7 at 13.  Dr. Puthuvel diagnosed Mr. McElroy with Conversion Disorder with anesthesia or sensory loss, persistent with psychological stressor.  Id. at 14.

Mr. McElroy's primary care physician referred him to another neurologist, Dr. Michael Reynolds, for a consultation on February 24, 2016.  Exhibit 6 at 10.  Dr. Reynolds's notes in the initial consult reflect the uncertainty surrounding Mr. McElroy's condition:

> His symptoms and exam findings are actually consistent with small fiber neuropathy.  However, the history is very strange.  It is possible that he had an acute small fiber neuropathy, and for whatever reason experienced it in an unusual fashion.  However, it is also possible that he has some degree of small fiber neuropathy from poorly controlled long-standing diabetes, which was never very symptomatic, and is now experiencing psychogenic symptoms.

Id. at 12.  Dr. Reynolds concluded that he would like to repeat the nerve conduction studies, examine him for somatosensory evoked potentials, and gather more information about his skin biopsy.  Id.  Mr. Reynolds did make a point of communicating to Mr. McElroy that "if we went through this entire workup and it

was negative, I would be left with no explanation except for a psychogenic etiology for his symptoms, and at that point I would recommend ongoing work with a mental health professional who was skilled in the management of these conditions." Id.

Mr. McElroy returned to Dr. Reynolds on March 29, 2016, to discuss the results from the EMG and NCS testing.  Exhibit 6 at 35.  Dr. Reynolds noted that the results were "mildly abnormal" and suggest "a mild sensorimotor polyneuropathy of mixed character."  Id.  Based on these results, Dr. Reynolds concluded that "[b]ecause of the profound disconnect between the extent of the patient's apparent large fiber neuropathy and small fiber symptoms, we will proceed with skin biopsy today for further evaluation of suspected small fiber neuropathy."  Id.

The results from the skin biopsy confirmed small fiber neuropathy.  Id. at 61.  Because none of the labs were able to identify a cause, Dr. Reynolds concluded that "the only reason for it that I can find is diabetes."  Id.

Mr. McElroy then sought an opinion from an additional neurologist, Dr. Andreas Runheim, in October 2016.  Exhibit 8 at 1.  Dr. Runheim ran several labs to evaluate the cause of Mr. McElroy's symptoms and noted that they were remarkable for, amongst other things, positive ANA.  Id.  Dr. Runheim concluded by noting that Mr. McElroy's neuropathic problems "may be stemming from" his October vaccinations.  Id. at 4.

Mr. McElroy returned to Dr. Kraft, the original neurologist, in December 2016, complaining of continued numbness and tingling, in addition to muscle tightness and stiff hands.  Exhibit 4 at 109.  Although Mr. McElroy reminded Dr. Kraft of the vaccinations he was administered shortly before the onset of his symptoms, id., Dr. Kraft again concluded that the most likely explanation of Mr. McElroy's small fiber sensory neuropathy was his diabetes.  Id. at 113.  However, Dr. Kraft ordered additional NCS/EMG before making a more conclusory assessment.  Id.

Based on the results from the NCS/EMG performed, on December 14, 2016, Dr. Kraft concluded that Mr. McElroy had neurophysiological evidence of an axonal sensorimotor polyneuropathy without demyelinating features.  Id. at 126.  In a follow-up to discuss the results, Dr. Kraft noted that Mr. McElroy "expounded on his history of flu vaccination followed 2 weeks later [by] the onset of hemisensory symptoms."  Id. at 147.  Dr. Kraft recorded his impression of Mr. McElroy as follows:

> Impression: #1. 67-year-old with onset of sensory symptoms as outlined in previous notes approximately 2 weeks after flu vaccination. The connection between the flu vaccination and the patient's constellation of symptoms is unclear however a vaccination reaction cannot be completely excluded. Whether the patient's symptoms were related to an immune reaction with cross reactivity is not clear but possible. #2. Diabetes induced sensorimotor polyneuropathy. #3. Lumbosacral spinal disease, stable.

Id. at 150.  Dr. Kraft's most recent examinations of Mr. McElroy in July and August 2017 mirror this same impression, noting that he continues to have a loss of sensitivity and abnormal sensation around his truncal area that "is not explained by diabetes induced sensorimotor polyneuropathy," and is, otherwise, "[u]nexplained."  Exhibit 10 at 20; Exhibit 13 at 12.  Further evaluation by a neurosurgeon was similarly unhelpful for diagnosing the cause of Mr. McElroy's condition.  Exhibit 11 at 6.

## II.        **Procedural History**

Mr. McElroy filed his petition for compensation on August 9, 2017.  Petitioner sought his award under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-1 to -34, as amended.  In his petition, Mr. McElroy claimed that the influenza and pneumonia vaccines he received on October 31, 2014, caused him to suffer "small fiber neuropathy and debilitating paresthesias."  Pet. ¶ 23.

On June 1, 2018, the Secretary filed his Rule 4(c) report.  The Secretary's report argued that compensation was not appropriate under the Act because "petitioner has submitted no reliable evidence of actual causation" beyond the temporal association between the vaccination and the onset or worsening of his condition.  Resp't's Rep. at 10-11.

A status conference was held on June 7, 2018.  During the conference, petitioner stated that he would like to proceed by obtaining and filing an expert report in support of causation.  The undersigned issued an order proposing instructions to any expert submitting an expert report.  Order, issued June 8, 2018.  After the parties did not object or comment on the proposed expert instructions, the instructions were issued on June 28, 2019.

Petitioner filed multiple status reports in July, August, and September 2018, stating that he was having difficulty finding an expert to provide an opinion.  In an affidavit submitted as part of the pending motion, petitioner's counsel, Ms. Nancy

Meyers, noted that during this time period she contacted two experts, Dr. Lawrence Steinman of Stanford University and Dr. Norman Latov, of Weill Medical College at Cornell University. Pet'r's Reply, filed Nov. 16, 2018, Aff. of Nancy Meyers at ¶¶ 13-14. Both physicians have participated in the Vaccine Program. Unfortunately for Mr. McElroy, both physicians declined to take on his case, citing the difficulty they would have establishing causation in the face of his pre-existing diabetes. Id.

On October 16, 2018, citing difficulty finding an expert report, the parties signed a joint stipulation calling for the dismissal of Mr. McElroy's petition under Vaccine Rule 21(a). Pursuant to the stipulation, the proceedings were ordered concluded. Order, issued Oct. 19, 2018, 2018 WL 6241546.

Mr. McElroy moved for reimbursement of attorneys' fees and costs shortly before the proceedings were concluded. Pet'r's Mot., filed Oct. 10, 2018. Petitioner's initial motion did not provide any argument in support of his eligibility for an award of fees and costs under the Vaccine Act.

The Secretary filed a response in opposition to petitioner's motion on October 24, 2018. The Secretary challenged the petition's reasonable basis. With leave of the court, Mr. McElroy addressed the merits of his eligibility for fees and costs in a reply filed on November 16, 2018.

In the ensuing months, the undersigned determined that additional briefing from the parties was necessary. In an order issued on February 6, 2019, the undersigned directed the parties to file supplemental briefs that addressed several issues presented by Mr. McElroy's request for fees and costs. Petitioner filed his supplemental motion on February 22, 2019. Respondent filed a response on April 19, 2019, and petitioner filed a reply on April 26, 2019.

In his supplemental motion, petitioner provides a well-written, if not persuasive, argument in support of the reasonable basis of the petition. Mr. McElroy's brief marshals six premises that, he argues, when considered in their totality, sum up to a finding that the petition was brought with a reasonable basis. These are:

(1) Petitioner had a flu vaccination (Fluarix) and a pneumonia (Prevnar 13) vaccination less than a month prior to developing his neurologic symptoms, meeting the temporal requirement;

(2) Petitioner had two skin biopsies, both of which confirmed small fiber neuropathy, along with positive nerve conduction studies, objective findings that discredit any suggestion of conversion disorder;

(3) Petitioner never had prior diabetic neuropathy symptoms and the symptoms he experienced after the flu vaccination were not typical of diabetic neuropathy;

(4) Petitioner's neurologists were supportive and considered the vaccine as a possible cause and documented that possibility in their records;

(5) Prior claims of flu vaccinations followed by small fiber neuropathy have all been settled by the Program; and

(6) No definitive alternate causes existed for Petitioner's complaints despite extensive testing.

Pet'r's Br., filed Feb. 22, 2019, at 6-7.

Respondent agrees, or at least does not directly contradict, most of petitioner's premises in support of a reasonable basis determination.  However, there is at least one important exception.  The Secretary opposes Mr. McElroy's characterization that his neurologists were "supportive" of the conclusion that the vaccine was a possible cause.  Respondent argues that Mr. McElroy's physicians "consistently linked his numerous complaints to causes unrelated to vaccination." Resp't's Br., filed Apr. 19, 2019, at 5.

The Secretary connects his assessment of the views of the treating doctors with the views petitioner's own counsel expressed.  Years later, after all medical records had been obtained, petitioner's attorney noted that the newly obtained records "don't reflect neurologic complaints or make reference to their relatedness to the vaccine, as we had hoped." Resp't's Br., filed Oct. 24, 2019, at 11-12 (citing Pet'r's Fees Mot., attachment 2 at 8).  The Secretary argues that by filing the petition and then hoping that the content of the medical records would turn out differently, "petitioner's attorney assumed the risk that she would not be able to later establish a reasonable basis for this claim."  Resp't's Br., filed Oct. 24, 2018, at 12.

### III.        **Standards for Adjudication**

Petitioners who have not been awarded compensation are eligible for an award of attorneys' fees and costs when "the petition was brought in good faith and there was a reasonable basis for the claim."  42 U.S.C. § 300aa—15(e)(1).  As

the Federal Circuit has stated, "good faith" and "reasonable basis" are two separate elements that must be met for a petitioner to be eligible for attorneys' fees and costs. Simmons v. Sec'y of Health & Human Servs., 875 F.3d 632, 635 (Fed. Cir. 2017).

"Good faith" is a subjective standard. Id.; Hamrick v. Sec'y of Health & Human Servs., No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007). A petitioner acts in "good faith" if he or she honestly believes that a vaccine injury occurred. Turner v. Sec'y of Health & Human Servs., No. 99-544V, 2007 WL 4410030, at * 5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). The Secretary has not challenged petitioner's good faith here[2] and the undersigned finds the Secretary's position that good faith exists to be reasonable. Accordingly, Mr. McElroy's eligibility for compensation turns on the question of the reasonable basis for the petition.

Reasonable basis, in contrast, is purely an evaluation of the objective weight of the evidence. Simmons, 875 F.3d at 636. Because evidence is "objective," the Federal Circuit's description is consistent with viewing the reasonable basis standard as creating a test that petitioners meet by submitting evidence. See Chuisano v. Sec'y of Health & Human Servs., No. 07-452V, 2013 WL 6234660, at *12-13 (Fed. Cl. Spec. Mstr. Oct. 25, 2013) (explaining that reasonable basis is met with evidence), mot. for rev. denied, 116 Fed. Cl. 276 (2014).

In practice, it has proven difficult to define the modicum of evidence that confers reasonable basis onto a petitioner. When the Federal Circuit and judges of the Court of Federal Claims have commented on the reasonable basis standard they often do not speak of the amount of evidence that confers reasonable basis. Instead, they have spoken to the types of situations where reasonable basis cannot be said to exist. For example, a petition based purely on "unsupported

---

[2] In his most recent brief, the Secretary conceives of a potential challenge to whether Mr. McElroy's petition was brought in good faith. He states that Ms. Meyers "arguably did not meet the good faith requirement to file the claim before attempting to procure an expert to opine despite the records." Resp't's Br., filed Apr. 19, 2019, at 9. Nevertheless, the Secretary appears to maintain the position that, on balance, Mr. McElroy's petition was supported by good faith. See Resp't's Br., filed Oct. 24, 2018, at 9, note 3 (the Secretary stating that he "does not challenge petitioner's good faith in bringing this petition"); Resp't's Br., filed Apr. 19, 2019, at 8 ("respondent did not challenge petitioner's good faith in filing this petition"). Accordingly, because the parties do not contest the issue of good faith, the undersigned declines to analyze it here. Greenlaw v. United States, 554 U.S. 237, 243 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present").

speculation," even speculation by a medical expert, is not sufficient to find a reasonable basis. Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1377 (Fed. Cir. 1994) ("Congress must not have intended that every claimant, whether being compensated or not under the Vaccine Act, collect attorney fees and costs by merely having an expert state an unsupported opinion that the vaccine was the cause in-fact of the injury"). As another example, when "the medical and other written records contradict the claims brought forth in the petition," a special master is not arbitrary in concluding that reasonable basis for the petition did not exist. Murphy v. Sec'y of Health & Human Servs., 30 Fed. Cl. 60, 62 (1993), aff'd without opinion, 48 F.3d 1236 (Fed. Cir. 1995) (table).

In Simmons, a judge found petitioner's failure to submit a petition that complied with the Vaccine Act's requirements supported a finding that reasonable basis for the petition did not exist. The judge reasoned that section 11(c) of the Vaccine Act requires that petitions "be accompanied with evidence of injury" [to] ensure[] that petitioners and their counsel make some effort to establish that there was a vaccination and an injury that may be linked to the vaccine." Simmons v. Sec'y of Health & Human Servs., 128 Fed. Cl. 579, 583 (2016), aff'd, 875 F.3d 632 (Fed. Cir. 2017).

One such requirement of the Act is that special masters cannot award compensation "based on the claims of petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa-13(a)(1). Special masters and judges of the Court of Federal Claims have interpreted this portion of the Act to mean that petitioners must submit expert medical opinion, either contained in the form of their medical records or in the form of expert opinion testimony, to support claims of causation-in-fact. See Waterman v. Sec'y of Health & Human Servs., 123 Fed. Cl. 564, 574 (2015) (citing Dickerson v. Sec'y of Health & Human Servs., 35 Fed. Cl. 593, 599 (1996) (referring to "the firm requirement that medical opinion evidence is ... necessary ... to support an on-Table theory" where medical records fail to establish the existence of a Table injury by a preponderance of the evidence); Schneider v. Sec'y of Health & Human Servs., No. 99-0160V, 2005 WL 318697, at *2 (Fed. Cl. Feb. 1, 2005) (stating that numerous cases construing 42 U.S.C. § 300aa–13(a) "hold uniformly that if an injured person's medical records do not disclose a *diagnosis* that the injured person's symptoms constitute a Table injury, then the petitioner must submit a medical expert's opinion interpreting the injured person's symptoms as a Table injury")).

If compensation is unavailable without medical opinion supporting causation, it follows that the absence of medical opinion evidence undermines the reasonable basis of the claim. See Mullen v. Sec'y of Health & Human Servs., 143

Fed. Cl. 504 (2019) (denying motion for review of decision finding no reasonable basis when a petitioner failed to comply with the requirements of 42 U.S.C. § 300aa-13(a)(1)).

## IV.     Discussion

If petitioner had obtained a "medical opinion" supporting the claim set forth in the petition, then the analysis of reasonable basis could start there.  However, neither Dr. Steinman nor Dr. Latov could present such an opinion.  Thus, as an alternative to "medical opinion," petitioner may rely upon "medical records."  See 42 U.S.C. § 300aa–13(a).

Although numerous physicians considered the possibility that Mr. McElroy's small fiber neuropathy was the result of his vaccination, none endorsed that viewpoint.  Statements that physicians considered a vaccine as a possible cause--statements often made at the suggestion of patients--do not constitute medical record supporting causation.  The hesitancy of Mr. McElroy's treating physicians to associate the vaccination with his injury seems to mirror the reaction of Dr. Steinman and Dr. Latov.  Both appeared to find that the facts of the case did not lend themselves to a conclusion indicating causality.

In lieu of objective evidence supporting the claim set forth in the petition, Mr. McElroy argues that his petition was supported by reasonable basis up and until his attorney learned he would not be able to provide a supportive medical opinion.  In other words, it appears that Mr. McElroy acknowledges that a petition without medical opinion supporting causation is a petition without reasonable basis to continue.  But, petitioner argues, reasonable basis existed up and until the point when the unavailability of medical opinion testimony was discerned.  Pet'r's Mot., filed Feb. 22, 2019, at 21.  In petitioner's words, he claims he had "a reasonable basis for instituting a claim and litigating the claim through and including the efforts of seeking an expert and concluding the case."  Id.

While reasonable basis may come and go during the pendency of a proceeding, see R.K. v. Sec'y of Health & Human Servs., 760 F. App'x 1010, 1012 (Fed. Cir. 2019); Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1377 (Fed. Cir. 1994), the change is usually because of a change in evidence.  After all, reasonable basis is satisfied with evidence.  Chuisano, 2013 WL 6234660, at *12-13.  In all cases, evidence develops throughout its pendency.  New medical testing is performed, new medical research is found, and new expert opinions are obtained.  Some of that evidence will support a claim of causation; some of it will not.

Mr. McElroy's position that reasonable basis should exist up and through the point when he discovered he would not be able to obtain medical opinion evidence directly contradicts the Federal Circuit's recent statements on the reasonable basis standard.  In <u>Simmons,</u> the Circuit held that the reasonable basis standard must be rooted in an evaluation of the objective evidence and cannot consider the "attorney's conduct."  <u>Simmons v. Sec'y of Health & Human Servs.</u>, 875 F.3d 632, 635 (Fed. Cir. 2017).  The objective evidence in Mr. McElroy's case did not change when Ms. Meyers came to the realization that she would not be able to obtain medical opinion evidence supporting her client's case.  From the standpoint of evidence, the record did not change from October 15, 2018, the date before Mr. McElroy filed a motion to dismiss his case, to October 17, 2018, the date after Mr. McElroy filed the motion to dismiss.

While the evidence did not change, petitioner's subjective evaluation of the strength of the case changed.  To find that reasonable basis was lost when Ms. Meyers realized that an expert report was not forthcoming would be to consider the attorney's conduct in the reasonable basis analysis in the same way proscribed by the Federal Circuit in <u>Simmons</u>.

Of course, Ms. Meyer's realization that expert support could not be obtained led to a prompt dismissal of the case.  To Ms. Meyer's credit, she appropriately wound down the proceeding as soon as this development materialized.[3]  But, a prompt dismissal does not change the (lack of) evidence.

Ultimately, Mr. McElroy brought a petition that was not fully developed.  He waited, for whatever reason, until after the filing of the petition to perform the type of diligence that would reveal whether the case could possibly be compensated.  When Ms. Meyers decided to forgo a comprehensive pre-filing review of the petition, she assumed the risk that neither medical records nor medical opinion supported the claim that the vaccinations caused small fiber neuropathy.  Here, the evidence does not establish that Mr. McElroy had a reasonable basis for the claim set forth in the petition and because it is petitioner's burden to establish such a reasonable basis before an award of attorneys' fees and

---

[3] Additionally, given that the reasonable basis determination is based solely on an evaluation of the objective within the case at hand, past settlements of similar types of claims have no bearing on whether reasonable basis existed in Mr. McElroy's case. Thus, Mr. McElroy's assertion related to past settlements of small fiber neuropathy claims is irrelevant to this determination.  Pet'r's Br. filed Feb. 22, 2019, at 8-9.

costs can be made, the undersigned finds that petitioner's motion for attorneys' fees and costs must be DENIED.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[4]

**IT IS SO ORDERED**.

S/ Christian J. Moran
Christian J. Moran
Special Master

---

[4] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party, either separately or jointly, filing a notice renouncing the right to seek review.